IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FRANCISCO D.,[1]                                            Case No. 3:19-cv-00780-SB

            Plaintiff,                                      **OPINION AND ORDER**

        v.

ANDREW M. SAUL, Commissioner of Social
Security,

            Defendant.

_____

**BECKERMAN, U.S. Magistrate Judge.**

Francisco D. ("Plaintiff") brings this appeal challenging the Commissioner of Social

Security's ("Commissioner") denial of his application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act. The Court has jurisdiction to hear this appeal pursuant

to 42 U.S.C. § 405(g). For the reasons explained below, the Court reverses the Commissioner's

decision and remands this case for further administrative proceedings consistent with this

opinion.

_____

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last
name of the non-governmental party in this case. Where applicable, this opinion uses the same
designation for a non-governmental party's immediate family member.

PAGE 1 – OPINION AND ORDER

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999)). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* Where the record as a whole can support either the grant or denial of Social Security benefits, the district court "'may not substitute [its] judgment for the [Commissioner's].'" *Bray*, 554 F.3d at 1222 (quoting *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## BACKGROUND

## I.   PLAINTIFF'S APPLICATION

Plaintiff was born in November 1971, making him forty-two years old on February 1, 2014, the alleged disability onset date. (Tr. 64.) Plaintiff has a limited education and past relevant work as a fisherman and warehouse worker. (Tr. 29, 203.) In his DIB application,

Plaintiff alleges disability due to spinal fractures, blindness in one eye, and "hearing voices."[2] (Tr. 64.)

The Commissioner denied Plaintiff's application initially and upon reconsideration, and on November 21, 2015, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 17.) Plaintiff and a vocational expert ("VE") appeared and testified at a hearing held on January 17, 2018. (Tr. 37-63.) On February 13, 2018, the ALJ issued a written decision denying Plaintiff's DIB application. (Tr. 17-30.) On March 14, 2019, the Appeals Council denied Plaintiff's request for review, making the ALJ's written decision the final decision of the Commissioner. (Tr. 1-6.) Plaintiff now seeks judicial review of the ALJ's decision. (Compl. ¶¶ 3-9.)

## II.    THE SEQUENTIAL PROCESS

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social

---

[2] To be eligible for DIB, "a worker must have earned a sufficient number of [quarters of coverage] within a rolling forty quarter period." *Herbert v. Astrue*, No. 07-cv-01016, 2008 WL 4490024, at *4 n.3 (E.D. Cal. Sept. 30, 2008). Workers accumulate quarters of coverage based on their earnings. *Id.* Typically, "the claimant must have a minimum of twenty quarters of coverage [during the rolling forty quarter period to maintain insured status]. . . . The termination of a claimant's insured status is frequently referred to as the 'date last insured' or 'DLI.'" *Id.* (citations omitted). Thus, Plaintiff's date last insured of March 31, 2019 (*see* Tr. 17) reflects the date on which his insured status terminated based on the prior accumulation of quarters of coverage. If Plaintiff established that he was disabled on or before March 31, 2019, he is entitled to DIB. *See Truelsen v. Comm'r Soc. Sec.*, No. 2:15-cv-02386, 2016 WL 4494471, at *1 n.4 (E.D. Cal. Aug. 26, 2016) ("To be entitled to DIB, plaintiff must establish that he was disabled . . . on or before his date last insured." (citing *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999))).

Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five

steps are: (1) whether the claimant is currently engaged in any substantial gainful activity; (2)

whether the claimant has a severe impairment; (3) whether the impairment meets or equals a

listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether

the claimant is capable of performing other work that exists in significant numbers in the

national economy. *Id.* at 724-25. The claimant bears the burden of proof for the first four steps.

*Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the

burden at any of those steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137,

140-41 (1987).

The Commissioner bears the burden of proof at step five of the sequential analysis, where

the Commissioner must show the claimant can perform other work that exists in significant

numbers in the national economy, "taking into consideration the claimant's residual functional

capacity, age, education, and work experience." *Tackett*, 180 F.3d at 1100. If the Commissioner

fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations

omitted).

## III.    THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is

disabled. (Tr. 17-30.) At step one, the ALJ determined that Plaintiff had not engaged in

substantial gainful activity since February 1, 2014, the alleged disability onset date. (Tr. 19.) At

step two, the ALJ determined that Plaintiff suffered from the following severe impairments:

"[D]egenerative disc disease status post-lumbar fracture, post-laminectomy syndrome, chronic

pain syndrome, peripheral neuropathy, a learning disorder, a personality disorder, and a loss of

visual acuity in the right eye." (Tr. 19.) At step three, the ALJ concluded that Plaintiff did not

have an impairment that meets or equals a listed impairment. (Tr. 19.) The ALJ then concluded

PAGE 4 – OPINION AND ORDER

that Plaintiff had the residual functional capacity ("RFC") to perform light work, subject to these limitations: (1) Plaintiff can sit, stand, and walk for six hours during an eight-hour workday, (2) Plaintiff can lift and carry ten pounds frequently and twenty pounds occasionally, (3) Plaintiff can push and pull in accordance with his lifting and carrying limitations, (4) Plaintiff can occasionally stoop, balance, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds, (5) Plaintiff cannot operate a motor vehicle, (6) Plaintiff cannot perform conveyor work, (7) Plaintiff cannot perform work that "requires fine depth perception," (8) Plaintiff cannot be exposed to workplace hazards, (9) Plaintiff must avoid "concentrated exposure" to uneven terrains, extreme cold, and "machinery that involves vibration," and (10) Plaintiff needs to be limited to "simple, routine and repetitive tasks and simple work-related decisions." (Tr. 21.) At step four, the ALJ concluded that Plaintiff was unable to perform his past relevant work as a fisherman and warehouse worker. (Tr. 29.) At step five, the ALJ concluded that Plaintiff was not disabled because a significant number of jobs existed in the national economy that he could perform, including work as a (1) laundry folder, (2) price marker, and (3) silver wrapper. (Tr. 29-30.)

## DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred by: (1) failing to provide specific and legitimate reasons for discounting the opinions of Plaintiff's examining psychologists, Tom Dooley, Psy.D. ("Dr. Dooley") and Paul Guastadisegni, Ph.D. ("Dr. Guastadisegni"); and (2) failing adequately to account for all of Plaintiff's mental limitations in formulating Plaintiff's RFC. (Pl.'s Opening Br. at 4, 8, 15.) As explained below, the Court reverses the Commissioner's decision because it is based on harmful legal error and not supported by substantial evidence in the record.

///

PAGE 5 – OPINION AND ORDER

I.    **MEDICAL OPINION EVIDENCE**

A.    **Applicable Law**

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (citation omitted). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (citation omitted). Conclusory findings are insufficient: "'The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.'" *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)).

///

///

///

**B.     Analysis**

Plaintiff argues that the ALJ failed to provide specific and legitimate reasons for discounting the opinions provided by Plaintiff's examining psychologists, Drs. Dooley and Guastadisegni.

**1.     Drs. Dooley's and Guastadisegni's Opinions**

Drs. Dooley and Guastadisegni conducted neuropsychological evaluations in 2015. (Tr. 368-74, 464-68.)

In his report, Dr. Dooley noted that Plaintiff's "major complaint appeared to be back pain," Plaintiff "did not appear to have any mood or thought complaints at this time," and Plaintiff stated that he had "been hearing voices for the last year," he dropped out of school in seventh grade, and his "chief complaint" to the Social Security Administration concerned his "difficulty with confusion and maintaining a train of thought." (Tr. 368-69.) Dr. Dooley also noted that Plaintiff "denied ever being involved with drugs or alcohol, but then stated that he did use marijuana and continues to use marijuana on occasion at this time,"[3] and that Plaintiff reported that he was looking for work and wanted to be "an executive at a bank," which caused Dr. Dooley to question whether Plaintiff "was trying to present as somebody who was out of touch with reality," because it was "not clear if he was joking [and] he appeared to be serious." (Tr. 368.) Additionally, Dr. Dooley noted that Plaintiff "gave a confusing and self-contradictory narrative in the course of the interview process," Plaintiff made "some bizarre comments in the course of testing,"[4] Plaintiff "acted as if he was hearing voices on one or two occasions" during

---

[3] The record reflects that Plaintiff has a history of alcohol and methamphetamine abuse. (Tr. 332, 351.)

[4] When Dr. Dooley asked if Plaintiff attends church, Plaintiff said, "'I've seen a dinosaur.'" (Tr. 371.)

Dr. Dooley's evaluation, and Plaintiff "act[ed] as if he still believed he was in California."
(Tr. 370.)

After conducting a clinical interview, Dr. Dooley administered several tests, which
revealed, among other things, that Plaintiff received a full-scale Intelligence Quotient ("IQ")
score of fifty-seven, placing him in the "extremely low range," and Plaintiff's "performances on
verbal or nonverbal scores were well below average and mostly in the mental retardation range."
(Tr. 372.) Dr. Dooley's primary diagnoses were a learning disorder and "[c]linical [s]yndromes."
(Tr. 373.) Dr. Dooley, however, stated that (1) it was "unclear" if Plaintiff "gave his full effort,"
(2) there was an "unusual" discrepancy between Plaintiff's "visual working memory and his
visual memory," (3) Plaintiff misspelled the word "square" but later spelled the word correctly,
which Dr. Dooley indicated "suggest[ed] possible malingering," (4) he asked Plaintiff to draw a
key and Plaintiff drew an image that was "primitive and hardly recognizable," which Dr. Dooley
again emphasized "brought up questions [about Plaintiff's] veracity and effort," (5) a
"malingering test such as [the Test of Memory Malingering] may be in order," and (6) the
veracity of Plaintiff's narrative is "sometime[s] doubtful [and thus] his statements are . . . in
question." (Tr. 371-72.)

Dr. Guastadisegni's report, on the other hand, noted that Plaintiff reported he has "no past
history of learning difficulties," he "does hear voices [that] say negative things to him," he "will
have conversations with the voice he hears," he does not have a "history of injuries related to
boxing," and he has a "history of methamphetamine use." (Tr. 465-66.) Dr. Guastadisegni also
noted, among other things, that Plaintiff received a full-scale IQ score of thirty-eight, "which is
within the extremely low range," Plaintiff's verbal IQ was "within the extremely low range," and
during a sorting test, Plaintiff "yelled on occasion, 'Shut up!' (directed off to the side)," and

PAGE 8 – OPINION AND ORDER

could not "persist with a conceptual approach" or "adapt to changing stimulus demands."[5] (Tr. 466.)

Additionally, Dr. Guastadisegni stated that (1) Plaintiff "presented as quite impaired" and "struggled on all cognitive tasks administered," (2) Plaintiff was "confused and at times appeared to be responding to internal stimuli," (3) Plaintiff is unable to work because he "suffers from a permanent brain injury," stemming from an accident in 2006, (4) Plaintiff "should be referred for an imaging study of his brain," (5) Plaintiff has "experienced a progressive decline in functioning since his brain injury in 2006," and (6) Plaintiff "has been having the emergence of psychotic symptoms, such as hearing voices." (Tr. 467-68.) Dr. Guastadisegni's primary diagnoses were neurocognitive and psychotic disorders due to Plaintiff's traumatic brain injury.[6] (Tr. 468.)

### 2.    The ALJ's Decision

#### a.    Dr. Guastadisegni

The ALJ assigned "little weight" to Dr. Guastadisegni's opinion. (Tr. 26.) The ALJ provided specific and legitimate reasons, supported by substantial evidence in the record, for doing so.

As an initial matter, the ALJ discounted Dr. Guastadisegni's opinion because the record included evidence suggesting that Plaintiff may have feigned results on his psychological testing. (*See* Tr. 26, "While not apparent to Dr. Guastadisegni, [during Dr. Dooley's] neuropsychological

---

[5] As noted above, Plaintiff received a full-scale IQ score of fifty-seven when Dr. Dooley evaluated him in August 2015.

[6] However, the record reveals that on the day of the 2006 accident, Plaintiff informed his physician that he "did not hit his head or lose consciousness," and that Plaintiff's physician stated a computed tomography ("CT") scan of Plaintiff's brain appeared "normal." (Tr. 413, 426-28.)

examination [three months later], the claimant was noted not to have made full efforts on testing, suggesting that Dr. Guastadisegni's assessment and conclusions about the claimant's abilities do not accurately reflect the claimant's true functional abilities."). Plaintiff argues that the ALJ erred in discounting Dr. Guastadisegni's opinion on this ground, noting that (1) Dr. Guastadisegni accounted for Plaintiff's effort by administering tests that "had validity measures built into them," and (2) Dr. Dooley acknowledged that it was "unclear" if Plaintiff "gave full effort." (Pl.'s Opening Br. at 11-12.) The Court is not persuaded by Plaintiff's arguments.

Courts in this circuit have upheld the rejection of a physician's opinion when, as here, the physician was unaware of evidence reflecting concerns about malingering or exaggeration. *See Shroma L. v. Saul*, No. 19-cv-05187, 2019 WL 4849504, at *4-5 (W.D. Wash. Oct. 1, 2019) (holding that the ALJ satisfied the specific and legitimate reasons standard, noting that the ALJ observed that the claimant's examining psychologist was "unaware" of "other opinions reflecting concerns about malingering or exaggeration," and stating that the "evidence of malingering/exaggeration in the medical record" undermined the psychologist's opinion); *Billy D. v. Comm'r of Soc. Sec.*, No. 18-cv-00015, 2018 WL 3747803, at *6-7 (E.D. Wash. Aug. 7, 2018) (holding that the ALJ did not err in discounting an examining physician's opinion based in part on evidence that the claimant was malingering, and noting that before the physician examined the claimant, the claimant underwent psychological testing which suggested that the claimant may have exaggerated); *see also Catina S. v. Saul*, No. 19-cv-03033, 2020 WL 1915889, at *7 (E.D. Wash. Jan. 16, 2020) ("An ALJ's finding that the claimant exaggerated symptoms and that the provider was not aware of the exaggeration is a specific and legitimate reason to reject the provider's opinion."); *Van Antwerp v. Berryhill*, No. 15-cv-02096, 2017 WL

1153033, at *4 (E.D. Cal. Mar. 28, 2017) (explaining that courts have allowed ALJs "to consider several factors in assessing the validity of test results, such as evidence of malingering or feigning results").

In the Court's view, it was reasonable for the ALJ to discount Dr. Guastadisegni's opinion in light of the concerns Dr. Dooley expressed about malingering and exaggeration. (*See* Tr. 371-74, reflecting that Dr. Dooley stated, among other things, that Plaintiff's statements are "in question" because the "veracity of his narrative are sometime doubtful," Plaintiff's veracity and effort were brought "into question" because he "spelled the same word both right and wrong within seconds," which "suggest[ed] possible malingering," and he asked Plaintiff to draw a key and Plaintiff drew an image that was "primitive and hardly recognizable," which Dr. Dooley again emphasized "brought up questions [about Plaintiff's] veracity and effort"). Accordingly, the Court concludes that the ALJ did not err in discounting Dr. Guastadisegni's opinion on this ground.

The ALJ also discounted Dr. Guastadisegni's opinion because Plaintiff's treating providers did not mention any "overt signs of mental illness" when they examined him. (Tr. 26.) Plaintiff argues that the ALJ erred in discounting Dr. Guastadisegni's opinion based on his "'normal' mental status exams" because (1) he does "not have 'mental illness,' but a cognitive disorder—Traumatic Brain Injury," and (2) a treating nurse practitioner referred him for a neuropsychological evaluation based on his "bizarre affect" and "tangential responses." (Pl.'s Opening Br. at 12.) The Court disagrees.

Although Dr. Guastadisegni opined that Plaintiff suffers from a neurocognitive disorder due to a traumatic brain injury, Plaintiff reported mental health concerns to Dr. Guastadisegni, including hearing voices. (*See* Tr. 464-65, showing that on May 12, 2015, Plaintiff informed

Dr. Guastadisegni that he had "mental health concerns, such as hearing voices," he

"now . . . hears voices, which he never did before," the voices "say negative things to him," and

he has "conversations with the voice he hears"; *cf.* Tr. 25, demonstrating that the ALJ cited

unremarkable mental status exams, which showed "no hallucinations" and "normal" affect and

mood; Tr. 309, reflecting that on November 14, 2014, over nine months after the alleged onset of

disability, an emergency room physician's examination revealed that Plaintiff's mood and affect

were normal and Plaintiff had "[n]o hallucinations"; Tr. 345-46, reflecting that on April 23,

2015, Plaintiff's nurse practitioner stated that Plaintiff had "no history of depression, anxiety, [or

any] other psychiatric diagnosis"; Tr. 351-52, showing that on June 4, 2015, Plaintiff's physician

stated that Plaintiff "denie[d] depression, anxiety, memory loss, mental disturbance, suicidal

ideation, hallucinations, [and] paranoia"; Tr. 386, indicating that Plaintiff completed an intake

form on July 9, 2015, which asked him to indicate if he "recently experienced" certain events,

and Plaintiff did not check the boxes for anxiety, depression, hallucinations, or mental

disturbance; Tr. 456, documenting Plaintiff's "normal" behavior, mood, and affect on exam). In

the Court's view, it was reasonable for the ALJ to discount Dr. Guastadisegni's opinion because

it was based in part on Plaintiff's report of overt signs of mental illness, which Plaintiff's

providers had not previously documented following mental status exams. *See Shultes v.*

*Berryhill*, 758 F. App'x 589, 592 (9th Cir. 2018) (holding that the ALJ met the specific and

legitimate reasons standard and noting that the ALJ discounted a physician's opinion based on

"evidence showing normal mental status examinations with no evidence of hallucinations or

delusions").

      In summary, the ALJ provided specific and legitimate reasons, supported by substantial

evidence, for discounting Dr. Guastadisegni's opinion. *See Samraing K. v. Comm'r of Soc. Sec.,*

18-01110, 2019 WL 4594598, at *2 (W.D. Wash. Sept. 20, 2019) ("The ALJ gave at least one specific and legitimate reason for discounting Dr. Mashburn's opinion and substantial evidence supports that reason; the Court holds that under these circumstances, the ALJ did not err."); *Hoge v. Berryhill*, No. 16-cv-00718-AC, 2017 WL 4881586, at *9 (D. Or. Oct. 27, 2017) ("[B]ecause the ALJ provided at least one specific and legitimate reason, supported by the evidence, to accord little weight to Dr. Freed's medical opinion, the ALJ did not err in doing so.").

### b.    Dr. Dooley

Plaintiff also argues that the ALJ erred in evaluating Dr. Dooley's opinion. The Court disagrees.

The ALJ gave "little weight" to the Global Assessment of Functioning ("GAF") score Dr. Dooley assigned Plaintiff, noting that "[a] low GAF score might reflect difficulties in a wide range of functional areas," whereas "the regulatory definition of disability focuses on [the claimant's] occupational functioning." (Tr. 26.) The ALJ did not provide any other reasons for discounting Dr. Dooley's opinion. (*See* Tr. 26-27.) Plaintiff argues that the ALJ erred because he did not consider Dr. Dooley's test results, ignored Dr. Dooley's diagnoses, failed to consider the factors under 20 C.F.R. § 404.1527(c), and failed to consider "how the low GAF score . . . did or did not reflect Plaintiff's occupational functioning."[7] (Pl.'s Opening Br. at 14-15.)

Although Plaintiff maintains that the ALJ only "provided a generic rejection of [the] GAF score[]" Dr. Dooley assigned to him (Pl.'s Opening Br. at 14), courts in this district have upheld an ALJ's rejection of an examining psychologist's opinion under similar circumstances. *See McManigal v. Colvin*, No. 3:15-cv-00685-MC, 2016 WL 4059152, at *6 (D. Or. July 27,

---

[7] Section 404.1527(c) describes the factors that impact the weight assigned to medical opinions.

2016) ("Plaintiff contends that because [examining psychologist] assessed a GAF score of 34, indicating severe impairment, the ALJ should have sought clarification of the extent and frequency of Plaintiff's diminished concentration. . . . The ALJ properly discounted the GAF scores because the scores include many factors, many of which have no bearing on occupational functioning. . . . Because a low GAF score may have been based on an individual's self-reported symptomatology or reflect difficulties in a wide range of functional areas, the ALJ's determination to give those scores little weight is supported by substantial evidence."); *Giffin v. Colvin*, No. 15-00800-PK, 2016 WL 3267715, at *9 (D. Or. May 16, 2016) (holding that the ALJ properly weighed the medical opinion evidence and "properly discounted the GAF scores because the scores include many factors, many of which have no bearing on occupational functioning").

After rejecting the GAF score, the ALJ was not required to reject each of the test results on which Dr. Dooley relied. *See, e.g.*, *Lee v. Berryhill*, 721 F. App'x 604, 606 (9th Cir. 2017) ("The ALJ specifically rejected the GAF score—a rating of Lee's *overall* psychological functioning—that Dr. Higgins-Lee assigned Lee. . . After rejecting the GAF score, the ALJ did not need to reject each individual psychological test result that Dr. Higgins-Lee relied on when assigning Lee's GAF.").

Even if the ALJ's rejection of the GAF score was not a legally valid basis for discounting Dr. Dooley's opinion, any error was harmless. In *Marsh v. Colvin*, 792 F.3d 1170, 1171 (9th Cir. 2015), the Ninth Circuit held that "harmless error analysis applies" when assessing "the impact of [an] ALJ's failure to even mention [a claimant's physician] or [treatment] notes, let alone [the] failure to give 'specific and legitimate reasons that are supported by substantial evidence' for

PAGE 14 – OPINION AND ORDER

rejecting [the physician's] medical opinion." *Id.* at 1172. The Ninth Circuit also explained how to evaluate whether an ALJ's error was harmless:

> Our precedents do not quantify the degree of certainty needed to conclude that an ALJ's error was harmless, and we would hesitate to suggest a rigid rule for all such cases. But it does seem that where the magnitude of an ALJ error is more significant, then the degree of certainty of harmlessness must also be heightened before an error can be determined to be harmless. In other words, the more serious the ALJ's error, the more difficult it should be to show the error was harmless.

*Id.* at 1173 (internal citations omitted) (remanding to the district court because the court could not "confidently conclude" that the ALJ's failure to address a medical opinion was harmless).

The Court can confidently conclude here that even if the ALJ failed to address every aspect of Dr. Dooley's opinion, any error was harmless. As discussed above, the ALJ appropriately discounted Dr. Guastadisegni's opinion based in part on Dr. Dooley's concerns about Plaintiff's effort during testing, the veracity of Plaintiff's statements, and the possibility that Plaintiff was malingering. Given Dr. Dooley's findings and the ALJ's reliance on those findings to reject another opinion about Plaintiff's psychological test results, the Court can confidently conclude that any error by the ALJ in failing to credit certain aspects of Dr. Dooley's opinion was harmless. *Cf. Gopher v. Comm'r of Soc. Sec.*, 281 F. Supp. 3d 1102, 1117 (E.D. Wash. 2017) ("The ALJ rejected [the examining psychologist's] opinion because his own objective test results indicated some symptom exaggeration. An ALJ is not obliged to credit medical opinions that are unsupported by the medical source's own data.") (citation omitted).

## II.    PLAINTIFF'S RFC

Plaintiff argues that the ALJ erred by failing adequately to account for Plaintiff's mental limitations in formulating the RFC. Specifically, Plaintiff argues that the ALJ erred because although the ALJ concluded that Plaintiff has moderate limitations in concentration, persistence,

and pace and formulated an RFC that limited Plaintiff to simple, routine, and repetitive tasks and simple work-related decisions, no medical provider concluded that Plaintiff could perform such tasks in spite of his moderate limitations in concentration, persistence, or pace. (*See* Pl.'s Reply at 4, emphasizing no medical professional opined that Plaintiff could perform the type of tasks described in the RFC).

The district court's decision in *Joseph M.R. v. Comm'r of Soc. Sec.*, No. 18-1779-BR, 2019 WL 4279027, at *9 (D. Or. Sept. 10, 2019), is instructive here. In that case, the ALJ found that the claimant had moderate limitations in concentration, persistence, and pace, and formulated an RFC that limited the claimant to simple, routine, and repetitive tasks. *Id.* The district court explained that "[t]he Ninth Circuit has found failure to include 'difficulties with concentration, persistence, or pace' in the VE hypothetical [derived from the RFC] to be reversible error when the ALJ found such a limitation[.]" *Id.* Consistent with this authority, the district court concluded that the ALJ committed reversible error because the record did "not include an opinion from any medical expert who interpreted [the claimant] as having a functional capacity to perform 'simple, repetitive, routine tasks' in spite of his moderate limitation in concentration, persistence, or pace." *Id.*

The district court's decision in *Juan R. v. Berryhill*, No. 17-7054, 2018 WL 6249706, at *10 (C.D. Cal. Nov. 29, 2018), is also instructive. In that case, the ALJ concluded that the claimant had moderate limitations in concentration, persistence, or pace, and could "perform simple, routine, repetitive tasks despite his moderate difficulties with concentration, persistence, and pace." *Id.* Like here, the ALJ also "omit[ted] any mention of difficulties in concentration, persistence or pace from [the claimant's] RFC." *Id.* The district court concluded that the ALJ

committed reversible error and, in doing so, emphasized that the ALJ failed to rely on any mental

health expert opinion:

> No medical opinions from either the treating, examining, or
> reviewing physicians indicate that despite having moderate
> limitations in concentration, persistence and pace, [the claimant]
> could nevertheless do simple, routine, repetitive tasks. The ALJ,
> who is not a medical professional, appears to have made an
> independent determination that [the claimant] is able to perform
> simple repetitive tasks despite his limitations in concentration,
> persistence, and pace, thereby improperly substituting his own
> judgment for that of the medical professionals. . . .
>
> Although the Ninth Circuit held in *Stubbs-Danielson v.
> Astrue*, 539 F.3d 1169 (9th Cir. 2008), that an ALJ's hypothetical
> that includes the ability to perform simple, routine repetitive tasks
> can, at least in some circumstances, adequately capture a
> claimant's limitation in concentration persistence or pace, 539 F.3d
> at 1174 (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)),
> *Stubbs-Danielson* is distinguishable from the instant case. In
> *Stubbs-Danielson*, the Ninth Circuit held that the ALJ's
> hypothetical including a limitation that the claimant could 'perform
> simple routine, repetitive sedentary work' was supported by the
> opinion of a medical professional who had found the claimant
> moderately limited in terms of pace but opined that the claimant
> nevertheless 'retained the ability to carry out simple tasks.'" *Id.* at
> 1172. Here, by contrast, no medical professional found that [the
> claimant] had moderate limitations in the areas of concentration,
> persistence, and/or pace but could nevertheless perform simple
> tasks. Accordingly, the ALJ's determination that [the claimant] can
> perform simple tasks despite his moderate limitations in
> concentration, persistence, or pace is not supported by any medical
> opinion in the record and, thus, is not supported by substantial
> evidence.

*Id.*; *see also Banks v. Colvin*, No. 15-cv002646, 2017 WL 113055, at *4 (C.D. Cal. Jan. 11,

2017) ("The ALJ did not rely on medical evidence in the record, including a medical source

statement, establishing that [the claimant] was capable of unskilled work despite her moderate

limitation in concentration, persistence, or pace. Therefore, the ALJ erred in failing to consider

and include that limitation in determining [the claimant's] ability to engage in unskilled work.")

(emphasis omitted).

Here, the ALJ concluded that Plaintiff was moderately limited in concentration, persistence, and pace, formulated an RFC and VE hypothetical that limited Plaintiff to simple, routine, repetitive tasks and simple work-related decisions, and determined that Plaintiff could perform unskilled work based on the VE's response to the ALJ's hypothetical. (Tr. 20-21, 30, 60-61.) The ALJ, however, did not rely on any medical opinion establishing that Plaintiff can perform such tasks and work despite his moderate limitations in concentration, persistence, and pace. The only medical provider who specifically addressed Plaintiff's limitations in concentration, persistence, and pace concluded that there was "[i]nsufficient [e]vidence" in the record to assess the severity of Plaintiff's difficulties in maintaining concentration, persistence, or pace. (*See* Tr. 82, showing that the non-examining state agency psychologist, Winifred Ju, Ph.D. ("Dr. Ju"), reached this conclusion on September 11, 2015). The ALJ discounted Dr. Ju's opinion because "additional evidence received at the hearing level provided sufficient information for [the ALJ] to formulate a [RFC] assessment." (Tr. 27.) The ALJ, however, failed to explain what additional evidence at the hearing level allowed him to conclude that Plaintiff could perform unskilled work and simple, routine, repetitive tasks and make simple work-related decisions, despite his moderate limitations in concentration, persistence, or pace. That is significant because Plaintiff testified about his concentration deficits at the hearing, but no medical expert testified at the hearing in response thereto.

Consistent with the authorities described above, the Court concludes that the ALJ committed reversible error in formulating Plaintiff's RFC because no medical provider concluded that Plaintiff could perform unskilled work and simple, routine, repetitive tasks and

make simple work-related decisions, despite his moderate limitations in concentration, persistence, or pace.[8]

## III.    REMAND

The Court "need not determine whether the three [credit-as-true criteria] are met because, even assuming that they are, [the Court] conclude[s] that the record as a whole creates serious doubt as to whether [Plaintiff] is, in fact, disabled." *Burrell v. Colvin*, 775 F.3d 1133, 1142 (9th Cir. 2014). Accordingly, the Court remands this case for further administrative proceedings.

## CONCLUSION

For the reasons stated, the Court REVERSES the Commissioner's decision and REMANDS this case for further administrative proceedings consistent with this opinion.

**IT IS SO ORDERED.**

DATED this 24th day of June, 2020.

STACIE F. BECKERMAN
United States Magistrate Judge

---

[8] Assuming there is medical evidence on point, an ALJ can simply "include[e] the statement that the claimant suffered specified deficiencies of concentration, persistence, or pace in [the VE] hypothetical." *Brink v. Comm'r of Soc. Sec. Admin.*, 599 F. App'x 657, 658 (9th Cir. 2015).